## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**VICKI GILLMORE,**

        Plaintiff,

vs.                                                                                    No. CIV 09-945 WJ/LFG

**MICHAEL J. ASTRUE,**
**Commissioner,**
**Social Security Administration,**

        Defendant.

### <u>MAGISTRATE JUDGE'S ANALYSIS<br>AND RECOMMENDED DISPOSITION[1]</u>

      **THIS MATTER** is before the Court on Plaintiff Vicki Gillmore ("Gillmore") Motion to Reverse or Remand Administrative Agency Decision, filed April 2, 2010.  [Doc. 17, 18.]  The Commissioner of Social Security issued a final decision denying benefits, finding that Gillmore was not disabled and not entitled to supplemental security income ("SSI") benefits.

      The Commissioner filed a response to Gillmore's Motion [Doc. 19], and Gillmore filed a reply [Doc. 20].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court recommends that Gillmore's motion be denied and this case be dismissed, with prejudice.

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

## I.  **PROCEDURAL RECORD**

On October 7, 2005, Gillmore applied for SSI [AR 75], alleging she was disabled since June 19, 2005[2] [AR 14, 115], due to a right elbow injury, right shoulder problems and pain, hand problems, arthritis in her heel, bipolar disorder, schizophrenia, post traumatic stress disorder ("PTSD") and depression.[3]  [AR 44, 392, 403.]  Gillmore's SSI application was denied at the initial and reconsideration levels. [AR 36, 35, 37, 44.]  On November 16, 2007, the ALJ conducted an administrative hearing in Albuquerque, New Mexico, at which Gillmore was represented.  [AR 384.]  On March 11, 2009, the ALJ issued a decision finding Gillmore not disabled. [AR 14-29.]  Thereafter, Gillmore filed a timely request for review.  On August 26, 2009, the Appeals Council, after considering additional evidence, denied Gillmore's request for review and upheld the final decision of the ALJ.  [AR 3.]  On September 25, 2009, Gillmore filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Gillmore was born on March 19, 1965 [AR 75] and was 42 years old at the time of the ALJ hearing.  [AR 389.]  Gillmore has a high school education and three years of college education at the Technical Vocational Institute (now known as CNM) in Albuquerque, New Mexico.  She was studying to attain a business certificate but was four or five courses short of attaining the degree. [AR 198, 324, 389.]

---

[2]Gillmore's actual SSI application states she has been disabled since September 29, 1998 [AR 75], when she had an ankle injury and infection.  However, this SSI application relates to an injury that allegedly occurred in the workplace on June 18, 2004 [AR 187], after which Gillmore contends she no longer was able to work.  Gillmore testified at the ALJ hearing she had not worked since September 28, 2005. [AR 389.] In one of the social security forms, she stated she was unable to work as of June 19, 2005. [AR 119.] The discrepancies in onset dates are unexplained.

[3]The initial social security forms stated that a "right elbow injury" prevented Gillmore from working [AR 118].  However, in the ALJ hearing, she alleged a number of impairments, as listed.

Gillmore's work history includes having been a waitress in the early and late 1990s, a stocker in a grocery store from 1991-1993, a mechanic in 1994-1995, and a mixer and forklift operator for American Gypsum from about January 2004 through mid-June 2005. [AR 119, 126.] Gillmore's earnings history is erratic.  In 2005, she earned over $11,000, and in 2004, she earned a high of $25,400.  In many other years, her earnings were minimal or nothing at all. [AR 61.]

Gillmore is divorced and has two children, who reside with the father.  Gillmore either lives alone in a trailer or with her boyfriend. [AR 107, 157, 198.] Gillmore apparently had a difficult childhood, including having been molested and raped.  She later was arrested and convicted for solicitation of first degree murder.  She served three years in prison from 1998-2000. [AR 393.] Gillmore was also arrested two times for domestic violence charges. [AR 324-26.]

Although many of the social security or medical records indicate Gillmore denied using drugs, she admits that she used cocaine or methamphetamines for ten years. [AR 326.] She advised the ALJ that she was "clean" since 1993 and denied current drug use. [AR 413-14.]

## II.  <u>STANDARDS FOR DETERMINING DISABILITY</u>

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[7] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, she is capable of performing other work.[11]

At step five, the ALJ can find that the claimant met her burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the

---

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[12]

In this case, the ALJ relied on testimony from a vocational expert for her finding of non-disability at step five of the analysis. [AR 28-29.] The Court observes that the ALJ mistakenly recited standards applicable in the five-step sequential process.  At step five, the ALJ stated that the "claimant generally continues to have the burden of proving disability at this step," although "a limited burden of going forward with the evidence shifts to the Social Security Administration." [AR 16.] This, of course, is an incorrect statement of law.[13]

The Tenth Circuit Court of Appeals previously explained if the claimant establishes at step four that she cannot return to her past relevant work, the burden of proof shifts to the Commissioner at step five to show the claimant retains the RFC to perform work in the national economy, given her age, education and work experience.  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). In an unpublished opinion, the Tenth Circuit further stated that "[t]he claimant has no burden on step five."  Stewart v. Shalala, 999 F.2d 548, at *1 (Table, Text in Westlaw), 1993 WL 261958 (10th Cir. Jun. 28, 1993) (citing Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)).  Thus, the ALJ's explanation of the claimant's burden at step five is not in accord with circuit law.  The ALJ should revise or clarify the summary of the five-step process.

III.   **STANDARD OF REVIEW**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v.

---

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

[13]Most, if not all, of the ALJ decisions presented to this Court recite similar boilerplate language summarizing the five-step process.  That summary should be reviewed and revised in accordance with Tenth Circuit law.

Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is or is not disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of all the evidence" [AR 14], the ALJ denied Gillmore's request for SSI. [AR 14-29.] The ALJ found that Gillmore had not been engaged in substantial gainful activity since September 28, 2005. [AR 16.]  The ALJ also found that Gillmore had "a medically severe combination of the following impairments: ankle arthritis, right elbow tendinitis; right dysfunctional shoulder syndrome with shoulder arthritis and spurring, status post repair of partial thickness tear of right AC joint, and mood disorder (major depressive disorder)."  [AR 16.]

In so finding, the ALJ noted Gillmore's history of cocaine and methamphetamine use, and her subjective reports to physicians of a history of schizophrenia and bipolar disorder, notwithstanding a lack of any diagnoses in the record from acceptable medical sources. [AR 16.] The ALJ further explained that the mental health diagnoses from Janice Penn, Ph.D.'s office were "totally derivative" of Gillmore's subjective reports of these diagnoses in the past.  Moreover, Gillmore was seen presumably by a registered nurse in Dr. Penn office.  Dr. Penn herself had a doctorate degree in nursing rather than clinical psychology.  Based on the record, the ALJ could not conclude Gillmore had impairments of schizophrenia and bipolar disorder as defined by the Social Security Act. [AR 16.]

At step two, the ALJ decided that the combination of Gillmore's impairments, including her major depressive disorder, were severe impairments.  However, the ALJ proceeded to determine, based the medical records, that Gillmore's mental impairment, standing alone, caused no more than "mild" limitations and therefore, was non-severe. [AR 17-18.] The ALJ further found that none of Gillmore's impairments or combination of impairments met listing criteria. [AR 18.] After comprehensively summarizing the medical records, testimony, and allegations of pain, the ALJ determined Gillmore had the RFC to perform a limited range of sedentary work. [AR 18-27.] Gillmore was unable to perform any of her past relevant work.  In considering her younger age,

7

education, work experience, and RFC, the ALJ concluded there were jobs existing in significant numbers in the regional and national economies that Gillmore could perform.  In so finding, the ALJ relied on a vocational expert's testimony that Gillmore, with the identified limitations, could perform the sedentary occupations of an addresser, bench hand, and assembler. [AR 28.]

IV.    **MEDICAL HISTORY AND BACKGROUND**

Gillmore supplied two older medical records from 1998 and 2000 to the Appeals Council, that were considered in the Council's denial of the request for review. [AR 6, 367, 375, 377.] Those two records pertained to Gillmore's ankle injury in 1998, and the subsequent treatment and infection. [AR 375, 377.]

The majority of Gillmore's medical records begin in July 2004, just after Gillmore sustained a right elbow injury at work in June 2004. [AR 54.] Gillmore alleged that while working for American Gypsum as a forklift operator, she attempted to clear a jam and ended up hitting her elbow against a piece of metal.  Although she continued to work that day and the next, she suffered from increasing pain and swelling of the elbow.  After several weeks, her right shoulder also began to hurt.  Gillmore apparently continued to work off and on after June 2004 into 2005.  She may have been assigned to different positions with American Gypsum during that time frame.  She also applied for short term and long term disability, as well as workers' compensation, which she received as of a workers' compensation decision, issued January 8, 2007. [AR 54.]

*2004 Medical Records*

On July 27, 2004, Gillmore first sought treatment for her right elbow and shoulder.  She selected Dr. B.J. Davis, O.D. as her treatment provider.  From late July 2004 to December 2004, she saw Dr. Davis about 34 times, sometimes just days apart.  Many of Dr. Davis's cursory 18 or 20

word-long treatment notes are illegible.[14]  The easiest portions to read are the date, the words –

"shoulder," "elbow," "pain," and regular prescriptions for "Lortab."[15] [AR 350-366.]

On October 21, 2006, workers' compensation physicians performed a "Panel Independent

Medical Examination" ("IME") of Gillmore, in relation to her claim.  The 19-page report, including

summaries of examinations by two physicians, is comprehensive.  Some of the medical records or

correspondence referred to in the "IME" are not part of this administrative record.  In addition, the

IME report, while acknowledging that Dr. Davis's 2004 and 2005 handwritten notes are difficult to

decipher, summarized portions of Dr. Davis's handwritten notes.  Gillmore apparently received

osteopathic manipulative therapy and diathermy[16] from Dr. Davis, who placed her on off-duty status

at times. [AR 189.]

Dr. Davis's note, dated December 30, 2004 [AR 350] indicates that Gillmore had fallen

while "four-wheeling" and landed on her tailbone.  Apparently, this fall did not contribute to or

exacerbate her previous elbow and shoulder injuries.

On several occasions in late 2004, Gillmore also saw a staff member in the office of Janice

Penn, Ph.D.  On November 9, 2004, Gillmore informed the staff member of previous diagnoses of

bipolar disorder and schizophrenia although she was not currently taking any medications for those

conditions.  She reported that hallucinations had increased after she stopped taking the medications.

---

[14]Some of Dr. Davis's 2004 and 2005 treatment notes, as addressed by the 2006 IME, are summarized later in this recommendation. [AR 187.]

[15]Lortab's generic name: acetaminophen and hydrocodone.  "Hydrocodone is in a group of drugs called narcotic pain relievers.  Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone.  The combination of acetaminophen and hydrocodone (Lortab) is used to relieve moderate to severe pain." www.drugs.com

[16]Diathermy is defined as "[t]he therapeutic generation of local heat in body tissues by high-frequency electromagnetic radiation, electric currents, or ultrasonic waves."  http://medical-dictionary.thefreedictionary.com

It is not clear when Gillmore purportedly received these diagnoses, who made the diagnoses, or when medication was prescribed that she later ceased to take. [AR 331.] Gillmore's medical records as of 2004 do not confirm the diagnoses.  Gillmore informed Penn's staff that at some point she stopped taking Seroquel[17] because it made her sleepy. [AR 331.] Gillmore was to start taking Zyprexa.[18] [AR 331.]

On November 16, 2004, Gillmore reported to Penn's staff that Zyprexa seemed to be working but she did not want to start Depakote.[19] [AR 331.] On November 22, 2004, Gillmore reported continued positive response to Zyprexa but also said she had an episode of "uncontrollabale crying."  Zyprexa was increased. [AR 333.] On December 6, 2004, Gillmore again saw someone in Penn's office and reported stressful events had occurred at work.  The pain of her hands and shoulders had increased her depressive symptoms. [AR 333.] The health care provider discussed adding Prozac to the Zyprexa to improve Gillmore's mood, but Gillmore refused because she feared the anti-depressant would have unwanted sexual side effects. [AR 333.]

### 2005 Medical Records

Beginning in January 2005 through September 2005, Gillmore saw Dr. Davis on 27 visits, for a total of 61 times over about a year.  Again, the records are cursory and partially illegible except for notations as to pain in Gillmore's shoulder, elbow and back.  Dr. Davis continued to prescribe

---

[17]"This medication is used with or without other medications to treat certain mental/mood conditions (such as bipolar disorder, schizophrenia). Quetiapine [the generic of Seroquel] is known as an anti-psychotic drug (atypical type).  It works by helping to restore the balance of certain natural chemicals (neurotransmitters) in the brain." www.webmd.com

[18]Zyprexa "is used to treat certain mental/mood conditions (such as schizophrenia, bipolar mania). It may also be used in combination with other medication to treat depression."  www.webmd.com

[19]Depakote "is used to treat seizure disorders, certain psychiatric conditions (manic phase of bipolar disorder), and to prevent migraine headaches."  www.webmd.com

Lortab and also, on occasion, prescribed Cymbalta,[20] Flexeril,[21] and Neurontin.[22]  Presumably, Dr. Davis continued to provide therapeutic treatment, although Gillmore never reported that any treatment during this time period helped her elbow or shoulder. [AR 337-350.]

In January 2005, Gillmore also saw Dr. Penn's staff several times.  She complained of feeling "really depressed."  She did not think Zyprexa had helped.  She had started taking Lamictal.[23] [AR 332.] On January 18, 2005, it appears that Dr. Davis prescribed Lexapro, an anti-depressant, and Cymbalta on February 2, 2005. [AR 348, 349.] An MRI was ordered in February but the results did not show anything "grossly problematic." [AR 347.] Earlier x-rays of Gillmore's shoulder and elbow were unremarkable as well.

On September 8, 2005, it was determined that Gillmore reached maximum medical improvement for her injuries, and that as a result of the accident, she was given a 4.99% whole person impairment.  She received permanent partial disability benefits. [AR 55.] As of September 8, 2005, there are no other medical records from Dr. Davis.

In October 2005, Gillmore applied for SSI.  During an October 7, 2005 interview with disability determination services, she was observed as sullen but cooperative. [AR 116.] Her right arm was in a brace. [AR 116.] She was prescribed an elbow brace.

_____

[20]Cymbalta or "duloxetine is used to treat major depression and anxiety.  In addition, duloxetine is used to relieve nerve pain (peripheral neuropathy) in people with diabetes. It is also used to treat pain caused by a condition called fibromyalgia that affects the muscles, tendons, ligaments, and supporting tissues."  www.webmd.com

[21]Flexeril is a muscle relaxant.  "It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries."  www.webmd.com

[22]Neurontin or "gabapentin is used with other medications to help control seizures in adults and children (3 years of age and older). It is also used to relieve nerve pain associated with shingles (herpes zoster) infection in adults."  www.webmd.com

[23]Lamictal or "lamotrigine is used alone or with other medications to prevent or control seizures (epilepsy) in people aged 2 and older.  It may also be used to help prevent the extreme mood swings of bipolar disorder in people aged 18 and older."  www.webmd.com

On November 3, 2005, Gillmore filled out an adult function report.  She lived alone in a trailer. [AR 107.] She was able to perform daily activities and personal grooming.  She prepared meals, watched television, talked on the telephone, visited her boyfriend, and cared for her two cats.  She could not "motorcycle" anymore. [AR 108.] She could dust, vacuum, do the laundry and perform some yard work. [AR 109.] Gillmore went outside two to three times a day.  She drove a car, walked, and shopped in stores.  She could handle finances.  She complained of having trouble lifting, reaching, completing tasks, and using her hands. [AR 112.] Gillmore could not lift more than 2-4 pounds.  She did not believe she could pay attention although she was able to follow instructions.  She could handle stress.  She wore an elbow brace but did not check the box indicating she used a cane. [AR 113-14.]

On November 11, 2005, Gillmore's boyfriend, Martin Montoya, filled out a third-party function report. [AR 96.] He reported that Gillmore could perform the same activities she described in her report.  She was not able to lie on her arm or shoulder for long periods due to pain. [AR 97.] Montoya felt she could follow instructions and pay attention. [AR 101.] She got along with authority figures and handled stress fine. [AR 102.] She had a brace or splint, but Montoya did not mark the box indicating Gillmore used a cane. [AR 102.]

On November 25, 2005, Dr. George Higgins completed a physical RFC assessment. [AR 299.] He determined that Gillmore could occasionally lift 20 pounds and frequently lift up to 10 pounds.  She could stand, sit or walk 6 hours and was unlimited in the ability to push or pull.  Although she alleged right arm and back pain, she performed typical light housework and yardwork.  There were frequent limitations in her ability to climb, balance, stoop, kneel and crouch; and occasional limitations in her ability to climb ladders and crawl.  Gillmore was limited in reaching

in all directions and in handling or fingering.  She should not be exposed to extreme cold and hazards. [AR 303.]

On December 23, 2005, Dr. Louis Wynne, Ph.D. performed a psychological examination of Gillmore. [AR 324.] He found Gillmore had poor eye contact and that her affect was flat and blunted, "congruent with depressed and irritable mood."  Gillmore claimed she did not know the purpose of the exam or Wynne's speciality.  She noted that she had hallucinations in the past but not when taking drugs.  Wynne observed Gillmore to have trouble paying attention and concentrating.

Gillmore reported that she was born in Los Angeles and suffered from an abusive childhood. She stated she took "over the counter" drugs for her arm pain, even though she frequently was prescribed narcotic pain killers in 2004-2005.  She told Wynne that she had cut her wrists in her early teen years and then 15 or 20 times more.  Gillmore was arrested and convicted for solicitation of first degree murder.  She served a three-year sentence. [AR 326.] She was arrested two times for domestic violence.  Gillmore had seen a mental health professional in her teens and had been admitted for a 90-day drug rehabilitation stay in relation to her use of crystal meth.  She also used cocaine for ten years but denied current use.

Wynne questioned her cooperation with the examination.  She was not evasive or resistive but appeared to view his questions as intrusive.  Still, Wynne did not suspect her to be "malingering."  Gillmore appeared to be able to read and understand basic written instructions.  Her ability to concentrate and to persist was at least moderately impaired.  She was not likely to interact well with the general public and co-workers.  She would have difficulty getting along well with supervisors.  Wynne diagnosed her with major depression, recurrent, severe, with psychotic features, and polysubstance abuse by history.  He assessed her with a GAF of 54. [AR 324-26.]

13

### *2006 Medical Records*

On January 11, 2006, Dr. Scott Walker completed a Psychiatric Review Technique form. [AR 308.] He found coexisting impairments, those of affective disorders and substance addiction disorders. [AR 308.] With respect to Gillmore's diagnosis of affective disorders, Dr. Walker wrote that a medically determinable impairment was present but it did not satisfy the diagnostic criteria. He further stated: "Major depression vs. Bipolar II (in context of cocaine/meth)." [AR 311.] He noted that the substance abuse disorder was in "alleged remission." [AR 316.]

Regarding functional limitations, Dr. Walker concluded Gillmore had mild restrictions in maintaining social functioning and in maintaining concentration, persistence and pace.  He found no other limitations. [AR 318.] In his notes, Dr. Walker commented that Gillmore had described a history of schizophrenia or bipolar diagnoses but that "psychosis while using stimulants could easily be confused with either [diagnosis]."  In reviewing medical records, Dr. Walker stated that a primary care provider's February 2005 note indicated Gillmore suffered from depression secondary to work difficulties.  Although Gillmore reported previous hallucinations, she did not currently suffer from hallucinations.  At this time, Gillmore was not taking any prescription medication.  Her GAF was 54.  Dr. Walker reasoned that her function reports did not indicate difficulties with concentration or interpersonal relations.  Dr. Walker concluded any mental limitation was non-severe. [AR 320.]

On January 17, 2006, Gillmore had a medical appointment with Jenna Hansche at Presbyterian's Southeast Clinic.  Gillmore was there to establish a primary care provider.  Hansche is a physician's assistant. [AR 287-88.] Gillmore complained of right elbow and shoulder pain that started two years ago.  She had worn a brace but it did not help.  Hansche noted that Gillmore's primary past medical history was mental health history.  She was diagnosed with schizophrenia, bipolar disorder and PTSD by the patient's report.  She was not being treated currently for these

14

conditions but was seen by a psychologist and psychiatrist (per reports by Gillmore).  She sought a referral to UNM's mental health center.  She denied hearing voices, psychosis or hallucinations. Gillmore was not sure of the basis of any of these diagnoses but stated she had a brother with the same problems.  Gillmore currently lived alone; both children lived with her ex-husband.  She had a boyfriend but he did not live with her.  She had smoked cigarettes since she was 13 years old, drank occasionally, and denied any use of drugs.[24] [AR 287.] Hansche prescribed Tylenol #3 for pain and referred Gillmore for mental health treatment.[25]

On January 20, 2006, Gillmore's SSI application was denied. [AR 36.] In the explanation of the denial, the SSA determined that "mentally, no severe MDI can be established." [AR 37.] Physically, she retained the capacity for light level work with limitations. [AR 37.]

On January 23, 2006, Hansche changed Gillmore's prescription for pain to Percocet[26] because she suffered an adverse reaction to Tylenol with codeine.  On February 8, 2006, Hansche again prescribed Percocet for the arm/elbow/shoulder pain as Gillmore said it was the only medication that helped.  She was taking "one tab" twice a day. [AR 253.]

On about February 9, 2006, Gillmore appealed the denial of her SSI application.  She alleged her depression was a lot worse.  She could not work and had no money since October 2005. However, she complained of no new problems.  Her hands were swollen and numb.  She stated she had no problems with her personal care, but could not work or ride motorcycles. [AR 90.]

---

[24]While Gillmore was in alleged remission from drug use, her denial of any drug use is not accurate based on other reports.

[25]Although Gillmore requested a mental health referral, the records do not indicate she followed up to obtain mental health care at this time.

[26]Percocet "is used to help relieve moderate to severe pain. It contains a narcotic pain reliever (oxycodone) and a non-narcotic pain reliever (acetaminophen)."  www.webmed.com

On February 15, 2006, Hansche referred Gillmore to an orthopedic specialist.  On April 13, 2006, Gillmore was seen by Dr. Loren Larson, an orthopedic specialist at UNM.  Gillmore explained her arm/elbow injury and stated she could not work.  She had exhausted short term disability benefits and was applying for long term disability.  That request was denied, but she obtained counsel and was also applying for social security benefits.  Dr. Larson noted that some tendons had been harvested in the area of the right wrist for a foot reconstruction in 1998. [AR 255.] Dr. Larson observed that Gillmore "seemed" to have significant pain in her right elbow and shoulder.  She further noted "certainly appearance of some exaggerated pain during the exam."  Dr. Larson recommended physical therapy and prescribed Feldene.[27] [AR 255-56.]

There is an initial physical therapy note, dated April 17, 2006. [AR 260, 264.] Gillmore was being seen for pain in the right arm and was depressed.  She currently was pursuing workers' compensation. Gillmore had difficulty lifting a two-gallon container of milk.  She denied taking any medications and was not in counseling.  She took things "day by day."  She was taking Percocet for pain. [AR 260.]

On April 27, 2006, Gillmore saw Hansche.  She had just started physical therapy when she had to go to California because her father passed away.  She was unable to attend her next therapy session.  Gillmore was taking 3-4 pills of Percocet a day.  She was concerned about stopping smoking; she usually smoked a pack a day.  Hansche prescribed Percocet again for her tendinitis and bursitis but noted she intended to have Gillmore sign a "pain contract" at the next visit. [AR 247.] There is no corresponding documentation that Gillmore signed a pain contract.

---

[27]Feldene or "piroxicam is used to reduce pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID)."  www.webmd.com

On May 7, 2006, Gillmore was involved in a motor vehicle accident and seen at UNM ER. She was treated for whiplash and prescribed another narcotic-based drug, Vicodin.[28] [AR 233, 237.] X-rays were taken but they were negative. [AR 271.]  Gillmore's gate was normal.  She suffered from neck and lumbar strain.  She was prescribed Percocet. [AR 239, 243.] On May  16, 2006, Donna Tully, P.A., saw Gillmore to follow up on injuries sustained in the accident.  Gillmore had seen a chiropractor and would see him five times a week for two weeks.  She was taking Percocet and normally took 4 tabs a day, but had increased the amount to 2 tabs, three times daily for neck and back pain.  Gillmore was not limping and could walk on her heels and toes.  She was assessed with acute cervical sprain, acute lumbar pain with strain and spasm, and chronic elbow pain.  She was prescribed Percocet and Baclofen.[29] [AR 244-45.]

On July 10, 2006, Gillmore saw Hansche.  She had an appointment to go to court in September related to her workers' compensation claim.  She was taking Percocet, one to two tabs every six hours.  She stated she was unable to go to physical therapy, because she could not make the copays (of $5.00).  She also could not go to the orthopedic specialist because she could not afford those copays either.  Chiropractic treatment[30] was helping the injuries suffered in the accident.  Hansche prescribed Percocet. [AR 230.]

---

[28]Vicodin is also known as Lortab.  "This combination medication is used to relieve moderate to severe pain. It contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen)." www.webmd.com

[29]"Baclofen is used to treat muscle tightness and cramping (spasms) caused by certain conditions such as multiple sclerosis and spinal cord injury/disease. It works by relaxing the muscles."  www.webmd.com

[30]There are no chiropractic records in the administrative record.

17

On July 12, 2006, the physical therapist discharged Gillmore from therapy because Gillmore did not make progress and attended no more than two sessions.  She did not re-schedule after she failed to appear for therapy on May 5 and May 18. [AR 258.]

On August 16, 2006, Gillmore saw Hansche for a rash on her leg.  She had been in the garden and might have been bitten by something.  Percocet was prescribed. [AR 228.] On August 23, 2006, Hansche wrote a letter on behalf of Gillmore stating she had severe arm and foot pain and was being treated for these problems.  Gillmore was unable to work because of these injuries, for at least the next six months. [AR 263.]

Social security case notes, dated October 3, 2006, indicate that Gillmore had limited range of motion in her neck after the accident but that x-rays of her lumbar back were normal.  The back and neck pain were resolving.  The right arm became weak after long use. [AR 225.]

On October 21, 2006, an IME was performed, in relation to Gillmore's workers' compensation claim.  The report is lengthy and thorough, with respect to treatment of the 2004 work injury, examinations of Gillmore, and testing.  The examining panel noted that Dr. Davis diagnosed Gillmore with tendinitis, back pain, and myositis.[31]  She was prescribed Lortab and Tylenol.  During Dr. Davis's frequent treatment of Gillmore, her symptoms did not improve.  She was prescribed Flexeril, Ultracet,[32] and Neurontin in 2004.

On exam of her elbow, there was no bruising or swelling noted.  She initially was restricted from lifting over 15 pounds with her right arm.  In September 2004, Dr. Davis released her back to work eight hours a day with the lifting restriction.  But, on September 20, 2004, Dr. Davis removed

---

[31]Myositis is the general term for swelling of the muscles.  http://www.myositis.org

[32]Ultracet "is used to treat moderate short-term pain (5 days or fewer). It contains 2 medications, tramadol and acetaminophen. Tramadol is similar to narcotic pain relievers (opiate-type). It acts on certain centers in the brain to give you pain relief. Acetaminophen is a non-narcotic pain reliever."  www.webmd.com

Gillmore from work until October 2004.  He prescribed an elbow brace for her and also, Zyprexa.

She was given Lortab for pain in October 2004. [AR 187-190.]

The IME panel noted Gillmore's few visits with Dr. Penn [Dr. Penn's staff] regarding mental

health issues.  The panel also described a Presbyterian Urgent Care note, dated November 15, 2004,

when Gillmore had fallen and struck her elbow the day before.  The x-ray was normal.  She was

prescribed Tylenol #3. On November 23, 2004, Dr. Davis prescribed Lortab and performed some

therapy.  In December 2004, Dr. Penn [her staff] noted Gillmore's depression was worse.

The IME panel discussed a December 12, 2004 medical record, indicating Gillmore had

swelling of both hands with pain, after she had thrown 20-pound objects at work.  She was issued

wrist supports.  Dr. Davis released Gillmore to work on December 15, 2004, and indicated it would

be a good idea to change jobs. [AR 192.] On December 26, 2004, Gillmore was seen in Urgent Care

after she fell from a "four wheeler" earlier that day.  She was given injections of pain medications

and prescribed Flexeril. [AR 191-92.]

The IME panel also discussed a fitness for duty evaluation performed by Dr. Reeve on

March 2, 2005, which is not part of the administrative record.  Dr. Reeve reviewed MRI results and

opined Gillmore could return to regular work duties. [AR 193.] In April 2005, Dr. Davis prescribed

lumbar support, Lexapro, and Lortab.  The panel also discussed a Presbyterian Urgent Care note,

dated May 30, 2005, where it was noted Gillmore was working at a "third position at her current

employment" and wearing braces and back support.  She requested either injections or medications

for pain.  Dr. LaPointe did not prescribe narcotics, nor did he give injections to Gillmore. [AR 193.]

The IME panel noted that Dr. Davis removed Gillmore from work on June 22, 2005, due to

pain.  Lortab was again prescribed.  On June 23, 2005, Dr. Davis completed an additional doctor's

statement related to Gillmore's short term disability.  He recommended Gillmore be off work for

3.5 weeks to continue therapy and pain medications.  This note is not part of the administrative record.

The IME panel discussed a letter written by Dr. Davis on September 8, 2005, in which he stated that Gillmore was diagnosed with right arm tendinitis, bursitis and myositis.  She was unable to use her right arm "at all."  She continued her prescriptions of Lortab.  On November 9, 2005, Dr. Davis signed "disability papers."   On December 29, 2005, Dr. Davis filled out a form letter indicating Gillmore was unable to work at all.  Her MMI was reached on September 8, 2005 and she was assigned an impairment of 8.5%. [AR 194.] None of these forms or letters from Dr. Davis are part of the administrative record.

The IME panel discussed all of Gillmore's allegations of mental health problems.  She was not on any medications for those diagnoses because she stated they would not help or they caused adverse side effects.  [AR 197.]

At the time of the panel's examination, Gillmore was taking Percocet and a sleeping pill. [AR 198.] She smoked one-half to three-quarters pack of cigarettes daily for 25 years.  She drank two-three bottles of beer "occasionally."  She did not use drugs. [AR 198.] At this time, Gillmore stated she lived with her boyfriend. [AR 198.]

On examination, Gillmore was alert and had a normal gate.  She got on and off the examining table without assistance.  She did not use a cane.  Her range of movement was somewhat abnormal or "lower than normal."  She exhibited extreme tenderness over the bursae, but the muscle strength in her right arm was 5/5. [AR 200.]

Earlier x-rays of Gillmore's right elbow were normal.  The panel noted "mild symptom magnification." [AR 202.]  The medical panel recommended Gillmore get an evaluation from Dr. Vichick, a specialist in upper extremity musculoskeletal disorders.   [AR 203.] They also

recommended occupational therapy.  She was not a candidate for surgery. [AR 203.] The panel did

not believe Gillmore had reached maximum medical improvement as of this date, and that she was

capable of returning to work within a sedentary physical demand.  She could lift up to 10 pounds

occasionally and a negligible amount frequently.   Gillmore could walk or stand but only

occasionally.  She should avoid forceful repetitive grip with the right hand and avoid using her right

arm above 90 degrees.  These work restrictions were noted as "temporary."  They would be

modified after treatment and MMI. [AR 204.]

On October 26, 2006, Gillmore's request for reconsideration of the initial denial of her SSI

application was denied. [AR 44, 210.] While she claimed her depression was worse, there were no

medical records discussing mental problems since February 2006. [AR 224.] Gillmore did not

respond to correspondence requesting information on any current treatment for mental problems.

[AR 224.]

### *2007 Medical Records*

On January 8, 2007, a Stipulated Compensation Order was entered with respect to Gillmore's

workers' compensation claim.  The Order notes that settlement was effective as of December 15,

2005. [AR 254.] She reached MMI on September 8, 2005, and was assessed with a 4.99% whole

person impairment.  Gillmore received monetary compensation as part of that claim.

On January 10, 2007, a CT scan of her elbow indicated some edema, but the results were

"nonspecific."

On May 2, 2007, Gillmore saw Dr. Vichick in accordance with recommendations from the

IME panel.  She stated that her entire right arm hurt.  For some reason, Dr. Vichick's records

indicate Gillmore was injured in 2002, rather than in 2004.  Dr. Vichick noted that Dr. Davis had

given Gillmore a series of injections and treatment with an electrode machine, but that she had not

improved in a year.  "In 2005, she states that she was fired by her employer after being told that her right upper extremity problems were not work related."  She then obtained an attorney.  Previous testing was negative.  X-rays indicated mild degenerative changes.  The etiology of Gillmore's pain was "undetermined."  "Continue modified duties." [AR 180-82.] At this time, it is not clear that Gillmore was working at all.

In May 2007, Gillmore had several physical therapy appointments. [AR 170, 178.] On May 23, 2007, she again saw Dr. Vichick.  Gillmore continued to suffer pain and had returned on this date "appearing depressed and not in good humor."  She saw no benefit of physical therapy.  She was given a trial of Ultram.[33]  She went to physical therapy once in June and reported no change in pain. [AR 169.]  On June 7, 2007, Dr. Vichik noted that exercises and therapy had not helped.  Ultram was discontinued due to side effects.  She stated she recently saw her primary care provider because of depression and nervousness, and that she was prescribed Nexium and Cymbalta.  [AR 165.] There is no corresponding medical record regarding a primary care visit or those prescriptions.

On June 27, 2007, Dr. Vichick saw Gillmore.  The diagnoses were dysfunctional right shoulder syndrome and history of progressively more severe right shoulder pain since 2002 [sic] injury. [AR 162.] "Continue to modified duty."  Again, Gillmore was not working at this point.  She was referred to Dr. Tabet, an orthopedic surgeon.

On July 25, 2007, Dr. Vichick saw Gillmore.  Her employer on these records is noted as "Eagle Materials." [AR 160, 162.] Gillmore was discouraged and complained of shoulder pain that had prompted her to go to the ER two weeks ago, where she was given a sling and pain medication.  [AR 160.] The ER record is not part of the administrative record.  Gillmore's shoulder was

---

[33]"This medication [Ultram or Tramodol] is used to relieve moderate pain. It is similar to narcotic pain medications."  www.webmd.com

"considerably better" after wearing the sling and doing home exercises.  She was to continue on "non-duty status." [AR 161.]

On August 7, 2007, Gillmore filed her disability report appeal.  She stated she dropped things with her right hand and had no muscle strength, as of April 1, 2006.  She was very depressed, and the medications did not help.  She was taking Percocet for pain.  Gillmore could no longer bowl or go "four wheeling." [AR 79-81.]

On August 23, 2007, Dr. Tabet saw Gillmore.  He observed her shoulder and posture as normal looking.  There was no swelling. [AR 156.] The MRI scan showed what might be a lesion in the proximal humerus.  Dr. Tabet conferred with other doctors and decided the MRI revealed an increase in the red marrow rather than a lesion.  She had fairly significant AC arthritis with a lot of fluid in the AC joint and space, along with spurring.  Dr. Tabet suggested arthroscopy of the shoulder with a subacromial decompression and distal clavicle excision.  He made no promises as to the outcome of the procedure. [AR 155.]

On September 26, 2007, the procedure was performed. [AR 150.] On October 11, 2007, Dr. Tabet noted that the wounds were well healed but that Gillmore was quite sensitive about the AC joint.  He referred her to physical therapy.  She took Hydrocodone for pain. [AR 124, 133.]

There is a final report of an MRI of the ankle related to right heel pain, dated October 23, 2007. [AR 144.]  This injury dates back to 1998.  The report notes post traumatic/post surgical deformity in posterior process of calcaneus involving Achilles insertion.  There were arthritic changes, but no discrete tears. [AR 144.]

On November 5, 2007, Hansche wrote a letter on behalf of Gillmore, in which Hansche stated she had been Gillmore's primary care provider since April 2, 2006.  Hansche treated her for problems with the right ankle since the injury and surgical repair in 1998.  Gillmore suffered from

considerable pain from the ankle injury and now had arthritis in that ankle.  Gillmore was not able

to work because of this injury and would need to continue treatment for pain "indefinitely."  [AR

143.]

On November 16, 2007, an ALJ hearing was held, at which Gillmore was represented by

counsel. [AR 384.] She stated she had not worked since September 28, 2005.  She presently received

workers compensation in the amount of over $1400.00 a month.  This payment started in September

2007.  Previously, she received $267.00 every two weeks but the amount was raised in September.

Gillmore would have been receiving workers' compensation for one year as of December 2007.  She

also received $234.00 in General Assistance and $132 in food stamps. [AR 390.]

Gillmore is right handed. [AR 398.] She described a tingling sensation in her right hand,

numbness, swelling, cramps and problems using the computer. [AR 398.] Her grip was affected by

these symptoms.  She was unable to do overhead lifting.  She had physical therapy for bone spurs

and arthritis in the right shoulder in the last year. [AR 400.] There are few corresponding records

in the administrative record.  The shoulder surgery did not help.  She still attended physical therapy

once a week and did home exercises. [AR 401.] It seems more likely that she was doing home

exercises since there are no corresponding therapy records.

Gillmore testified that she felt pain if she walked 20-30 feet.  She used a cane, although

previous medical records and social security reports do not indicate use of a cane. [AR 403.]  She

was diagnosed with bipolar disorder, schizophrenia, PTSD, and manic depression.  The ALJ

observed that psychologist Penn was not a clinical psychologist.  Thus, the ALJ did not consider

Penn to be an adequate medical source to render the mental health diagnoses.  The ALJ further

stated that Penn was a psychiatric nurse.  Gillmore believed she was diagnosed with schizophrenia

in her 20's, but did not know why she received this diagnosis. [AR 407, 408.] There was no follow-up treatment for it. [AR 408.]

Gillmore stated she was prescribed or given a cane in 2000 and had been using one since 1999, although her subsequent testimony about how much she used the cane is unclear. [AR 409-412.] The medical record notes do not reflect that Gillmore was using a cane in 2004-2008. Gillmore was vague as to whether she used the cane with her right or left hand.  [AR 411.]

When asked about her use of cocaine and methamphetamines, Gillmore stated she was "clean" since 1993, and had not used any other street drugs. [AR 414] This is inconsistent with a report by Gillmore that she was in a 90-day drug treatment program in about 2003.

The ALJ provided the vocational expert with a hypothetical where the claimant could lift 10 pounds occasionally, and a negligible amount frequently (less than two pounds).  The claimant could sit for six hours but stand or walk only two hours, with no more than 15 minutes of continuous standing or walking.  Gillmore's ability to push and pull with her lower extremities was unlimited but she had strength limitations in her upper extremities.  She could occasionally climb ramps and stairs, but could never climb ropes, ladders or scaffolds.  She could occasionally balance and stoop. [AR 423.] She was not allowed to reach overhead other than occasionally.  She could understand, remember and carry out simple instructions. [AR 423.]

Based on this hypothetical, the VE testified Gillmore could do sedentary work, e.g., addresser, bench hand, unskilled assembler. [AR 424.] If the hypothetical were changed to someone who used assistive devices while ambulating for more than a very brief time, this could impede her ability to do the jobs. [AR 424-25.] If the hypothetical included a limitation as to repetitive fingering, she could not perform any of the listed jobs. [AR 426.]

On December 6, 2007, Dr. Tabet saw Gillmore, who still complained of pain in the right shoulder. She had "maxed out" in physical therapy. They were recommending home exercises. She was not at MMI yet. [AR 132.]

### *2008 Medical Records*

On January 17, 2008, Gillmore saw Dr. Tabet. The pain was unchanged. She suffered now from significant sleep interference. The range of motion might be a little better. She needed to do the exercise program a little longer. [AR 131.]

On March 13, 2008, Dr. Tabet concluded that Gillmore probably would not improve. She was severely limited in her ability to do things with her right arm. There was nothing to offer her at this point. She was at MMI and was 15% limited due to lack of range of motion, 10% limited due to arthroplasty of the AC joint, and 10% limited for strength deficit, which totaled 35% or 21% of the whole body. Dr. Tabet referred Gillmore to a pain management program. [AR 128, 129.]

On April 8, 2008, Gillmore was seen by Dr. Eva Pacheco for pain management. Dr. Pacheco had to draw out the patient's history as only one medical record was provided. Post operatively, Gillmore reported that her shoulder still hurt and was "worse now." [AR 134.] In December 2007, Gillmore continued her home exercise program. She stayed home watching television up to 10 hours a day, could walk to her door, and drive to see friends. She stated Dr. Tabet released her to work, with restrictions.

Gillmore told Dr. Pacheco that the pain interrupted her general activity, relationships with people, and enjoyment of life. She could not concentrate and felt sad and depressed. She slept up to six hours a night. She had been on Lortab in the past. She discussed her mental health diagnoses and stated she stopped any medications she was prescribed for those conditions, and also stopped counseling. She claimed to have attempted suicide in 1994 by slitting her wrists. She was homeless

at some point for three years and traveled the United States with an ex-boyfriend. There were four alcoholics in her family. She lived with her boyfriend. She denied alcohol or drug use. [AR 135.]

Dr. Pacheco observed Gillmore to hold her right upper extremity close to her body and to guard it during the exam. Her range of motion and strength could not be accurately measured due to pain. Gillmore expressed multiple complaints of anxiety and depression. It appears from this record that Dr. Pacheco wanted to obtain a urine drug screen, but it is unclear whether the screen was performed. [AR 136.] Dr. Pacheco also wanted to examine Gillmore again when her pain was under better control. [AR 136.] There is no indication that Dr. Pacheco saw Gillmore again.

### *2009 Records*

On March 11, 2009, the ALJ issued an adverse decision on Gillmore's SSI application. [AR 14-29.] The ALJ engaged in a lengthy discussion of the medical records, testimony, and alleged impairments before denying the SSI application.

On August 26, 2009, the Appeals Council denied the request for review after considering additional records. [AR 3, 6.]

## V.  DISCUSSION

### A.  Alleged Legal Error

Gillmore asserts that the ALJ's step two, three, and four findings were not supported by substantial evidence and were legally erroneous. [Doc. 18, pp. 11-23.] Gillmore also asserts that the ALJ's credibility finding was not supported by substantial evidence and constituted legal error. [Doc. 18, p. 24.]

### B.  Step Two Findings

Gillmore argues that her depression should have been found severe at step two of the sequential evaluation. The ALJ found that the combination of physical impairments and depression

were severe, but that standing alone, Gillmore's depression or mood disorder "does not cause more than minimal limitation in her ability to perform basic mental work activities and is therefore non-severe." [AR 18.]

The ALJ's discussion of her step two findings and the pertinent medical records is comprehensive.  The Court concludes that substantial evidence supports the finding and that the ALJ did not commit error.

In discussing the records, the ALJ noted that Gillmore underwent a consultative psychological evaluation by Dr. Louis Wynne on December 23, 2005. [AR 16-17.] The ALJ acknowledged Dr. Wynne's diagnosis of "major depression, recurrent, severe with psychotic features, and polysubstance abuse (methamphetamine and cocaine), by history." [AR 17.] However, the ALJ carefully explained she gave only limited evidentiary weight to Dr. Wynne's diagnosis because the administrative record confirmed that Gillmore had not received therapy or counseling since January 2005.  She did not take any psychotropic medications for the alleged diagnoses when Dr. Wynne examined her.  [AR 324-25.]   Moreover, the administrative record indicated that Gillmore, most likely, had not taken any anti-depressant medications since June 2005.  Even then Gillmore took Cymbalta for less than two months and may have taken Lexapro for two-three months.  [AR 17, 156, 165, 197, 345, 349.]

The ALJ further discussed Gillmore's reports that she quit taking medications for alleged schizophrenia and bipolar disorder because of "significant" side effects, which she never specified. [AR 197.] In addition, the ALJ noted that one consultative reviewer had observed that Gillmore's reported auditory hallucinations or mental health diagnoses could have occurred during active methamphetamine or cocaine use. [AR 320.]

Moreover, the ALJ explained that Gillmore's testimony regarding her drug use or abstinence was questionable and lacked credibility.   For example, Gillmore testified she had not used methamphetamines or cocaine since 1993, but she also told Dr. Wynne that three years prior to the December 2005 appointment with him, she had been in a 90-day drug treatment program for her illegal drug use. [AR 326.]

In addition, the ALJ discussed 2004 medical records that reflected Gillmore's refusal to use anti-depressants because of sexual side effects.   This suggested to the ALJ that Gillmore's depression was not sufficiently disruptive to sacrifice her libido.   Based on the undisputed medical record, the ALJ concluded that Gillmore chose not to treat her mental impairments because it was not limiting as she alleged. [AR 17.]

In so finding, the ALJ also thoroughly addressed Gillmore's own daily activity report and the third-party activity report, neither of which indicated significant mental limitations.   Gillmore could fix meals, do housework, run errands, go to movies, drive, care for pets, handle her finances, and socialize. [AR 18.]

While Gillmore argues that Dr. Wynne's report and assessment of moderate impairments are entitled to more weight [Doc. 18, p. 12], the Court concludes that the ALJ thoroughly explained why she discounted Dr. Wynne's diagnoses and limitations.   Gillmore also asserts that the ALJ was incorrect in stating that the claimant took psychotropic medications for less than two months. However, Gillmore's citations to the administrative record do not confirm that Gillmore took any anti-depressant or psychotropic medication for more than a short duration.   She was prescribed a

number of such medications by different providers, but there is no confirmation that she took any medication, other than narcotic pain medication, for an extended period of time.[34]

The Court finds that substantial evidence supports the ALJ's step two findings.  Moreover, the ALJ did not commit error because she properly considered the limiting effects of all of Gillmore's impairments, including the mental disorder, in determining any "distracting effects of any residual pain" and Gillmore's residual functional capacity. [AR 25.]  *See* Stokes v. Astrue, 274 Fed. App'x 675, 678-79 (10th Cir. Apr. 18, 2008) (unpublished) (*citing* 20 C.F.R. §§ 404.1545(e), 416.945(e)).

C.     Step Three Findings

"At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges as so severe as to preclude substantial gainful activity." Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996) (internal citations omitted).  The Tenth Circuit Court of Appeals further explained:

> [The claimant] has the "step three burden to present evidence establishing her impairments meet or equal listed impairments." Fischer-Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). To satisfy this burden, [the claimant] must establish that her impairment "meet[s] all of the specified medical criteria. An impairment that manifests only some ... criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

Peck v. Barnhart, 214 F. App'x 730, 733 (10th Cir. Dec. 26, 2006) (unpublished).

---

[34]The Court observes that Gillmore's argument relied on a number of medical records that are referred to in other records and notes but that are not part of the administrative record. [Doc. 18, pp. 2-3, 8, 14] (*citing* AR 165, 193, 194).  Moreover, while Dr. Davis prescribed anti-depressant medications on occasion, there is little record confirmation that Gillmore took the medications for any sustained period.  Also noteworthy is that fact that the cited form letter or disability forms filled out by Dr. Davis [AR 193, 194] do not indicate Gillmore was impaired by alleged depression.  In addition, in August 2006, Hansche's statement that Gillmore was unable to work for at least six months contains no reference to alleged mental impairments. [AR 263.]

Gillmore argues that the ALJ erred by not discussing the particular evidence she relied on in finding the ankle and elbow/shoulder impairments did not meet listing criteria at step three. The Court disagrees, concluding that the ALJ did not err and that if she did, any error is harmless. Even if the ALJ's step three findings are brief, her step four findings are extensive and provide a sufficient basis to uphold the step three conclusion. *See* Fischer-Ross, 431 F.3d at 733-35 (ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment).

Moreover, Gillmore bears the burden of proof at step three to show that an impairments meet listing criteria. Gillmore did not provide evidence showing she met any or all criteria of a particular listing. *See* Tucker v. Barnhart, 201 Fed. App'x 617, 620 (10th Cir. Oct. 19, 2006) (unpublished) (finding the ALJ's failure to discuss specific listings was not reversible error where claimant did not provide evidence showing she met all of the specified medical criteria of a particular listing).

Gillmore further asserts that the ALJ's step three finding is a "bare conclusion" that is "beyond meaningful judicial review," because the ALJ cited only a definitional section in the musculoskeletal system listings rather than identifying the specific listings in the analysis. In support of her position, Gillmore relies on Clifton, 79 F.3d at 1009. However, the present case is distinguishable from Clifton, where the ALJ provided only a summary conclusion that the appellant's impairments did not meet or equal any listing. *Compare* Baldwin v. Barnhart, 167 F. App'x 49, 52 (10th Cir. Feb. 14, 2006) (unpublished) (finding the ALJ sufficiently addressed pertinent medical criteria even if the terminology did not precisely mirror the terminology used in a specific listing).

The ALJ could have been more precise in discussing the specific listing criteria at step three, but the Court concludes that the ALJ's findings are not beyond meaningful judicial review. In

addition, the Court determines that substantial evidence supports the ALJ's step three findings, even though the evidence is discussed in later steps of the sequential analysis, namely in the ALJ's careful and thorough analysis of Gillmore's RFC. [AR 18-28.]

     D.    <u>Step Four Findings</u>

Step four of the evaluation process requires the ALJ to evaluate the claimant's physical RFC. In determining a claimant's physical abilities, the ALJ should "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." <u>Winfrey v. Chater</u>, 92 F.3d 1017, 1023 (10th Cir. 1996) (*citing* 20 C.F.R. § 404.1545(b)).

As part of the RFC determination, the ALJ must consider the credibility of the claimant's subjective testimony about her pain and its effect on her ability to work. S.S.R. 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Credibility findings are "peculiarly the province of the finder of fact, and . . . [will not be] upset . . . when supported by substantial evidence." <u>Kepler v Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995) (internal citations and quotations omitted). The reviewing court does not substitute its own judgment for that of the fact finder. However, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." <u>Id.</u> (internal citations and quotations omitted).

The ALJ determined that Gillmore had the RFC to perform a limited range of sedentary work. [AR 18.] The ALJ found that Gillmore could lift and carry up to ten pounds occasionally and could lift and carry a negligible amount (less than two pounds) frequently or constantly. She could sit for six hours out of an eight hour work day, stand or walk for two hours out of the same work day but should not stand or walk more than fifteen minutes continuously. She could push and pull with her lower extremities in a manner consistent with the strength limitations allows, but could not push

and pull with her dominant right upper extremity within those strength limitations on more than an occasional basis. Otherwise, Gillmore had no limitations. She could occasionally climb ramps and stairs but was never to climb ropes, ladders, or scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl. Gillmore had no visual or communicative limitations. She was to avoid concentrated exposure to extreme cold and to hazardous equipment. She was limited in overhead reaching to no more than "occasionally" with her dominant right upper extremity and in using her dominant right upper extremity for application of a forceful grip, such as in twisting off a jar top, to no more than on an occasional basis. Gillmore could understand, remember, and carry out simple instructions and tasks. Gillmore's abilities and the stated limitations comported with a limited range of sedentary work. [AR 18-19.]

In reaching the step four findings, the ALJ provided a 10-page, single-spaced analysis, including discussions of Gillmore's testimony, right foot impairment, right upper extremity impairments, failure to follow prescribed treatment to some degree, allegations of pain, medical source statements, and the accompanying medical records. [AR 18-28.] The analysis is thorough and thoughtful.

1.      Gillmore's first sub-argument concerns the ALJ's supposed finding that Gillmore had the RFC to perform a "full or wide range of sedentary work. R. 18." [Doc. 18, p. 16.] Gillmore claims that although the ALJ purported to find an RFC for a limited range of sedentary work, the ALJ actually assessed an RFC for the full range of sedentary work. [Doc. 18, p. 17.] The Court disagrees. The ALJ was specific in setting forth limitations and stating that Gillmore had the RFC to perform a "limited range of sedentary work." [AR 18.]

2.      Next, Gillmore argues that the ALJ failed to assess her ability to engage in repetitive bilateral manual dexterity. [Doc. 18, p. 18.] However, she provides few citations to any of the

medical evidence showing she had any limitations in repetitive bilateral <u>manual</u> dexterity.  Gillmore again relies on a reference to Dr. Davis's form letter that is not part of the administrative record [AR 194], wherein Dr. Davis supposedly found Gillmore could not use her right arm "at all."  Dr. Davis's actual record from September 8, 2005 is cursory in nature, stating "tendonitis, pain rt arm, pain rt elbow, myositis, [illegible] [illegible] continue with treatment. [AR 337.] Gillmore also relies on Dr. Vichick's medical examination on July 7, 2007. [AR 165.] Yet, that record repeatedly notes problems with the right shoulder and right elbow.  The examination and record do not appear to address any issues with manual dexterity.  Dr. Tabet's March 13, 2008 record [AR 128], also relied upon, is similar in that Dr. Tabet's examination and assessment are specific to the right shoulder and arm.  There is not examination or assessment of her manual dexterity.

Gillmore argues that Social Security Rulings 85-15 and 96-8p place an affirmative duty on an ALJ to assess a claimant's ability to engage in repetitive bilateral manual manipulation before concluding she can perform sedentary work. [Doc. 18, p. 18; Doc. 20, p. 4.] SSR 85-15 discusses fine manual dexterity in terms of sedentary work, but SSR 96-8p does not.  Gillmore may have intended to cite another social security ruling.  *See, e.g.,* SSR 96-9p ("Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity .... Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." SSR 96-9p, 1996 WL 374185, *8 [SSA July 2, 1996]).

In any event, an ALJ is not required to incorporate impairments into her hypothetical question to the VE that are not supported by the medical evidence.  *See* <u>Talley v. Sullivan</u>, 908 F.2d 585, 588 (10th Cir. 1990) (in determining whether a claimant can return to a past line of work, an ALJ's hypothetical questions to the VE must include only those impairments that the ALJ accepts as true); *see also* <u>Decker v. Chater</u>, 86 F.3d 953, 955 (10th Cir. 1996) (holding that hypothetical

34

question to VE need only include impairments that are supported by evidentiary record).  Here, there are no medical records indicating Gillmore was limited in her ability to use her hands.  In other words, Gillmore did not cite any medical records indicating medical care providers determined she had "significant manipulative limitation of [her] ability to handle and work with small objects with both hands . . ." *See* SSR 96-9p, 1996 WL 374185, at *8.  To the extent that Gillmore might have relied on disability services' non-examining physician's assessment [AR 299, 302], the ALJ properly and adequately explained why she accorded less weight to that opinion than that of the IME panel. [AR 27.]

Moreover, there is substantial medical evidence indicating that Gillmore could engage in sedentary physical work, which by definition requires the use of her hands. [AR 22, 204.] The Court does not repeat the ALJ's entire analysis here due to its length but further states the step four findings are supported by substantial evidence that is described at length in the ALJ's written decision. [AR 18-28.]

3.    Gillmore asserts that the ALJ "erred in assessing Dr. Davis's RFC opinion." [Doc. 18, pp. 18-21.] Gillmore asserts that Dr. Davis was a treating physician who opined she could not use her right arm at all and could not work, at least as of the end of December 2005. [Doc. 18, p. 18.] Again, Gillmore relies on references to Dr. Davis's form letters or disability forms that are not part of the administrative record but that were discussed in the IME panel's review of the records. [AR 193-194.]

The ALJ provided ample and supported discussion of why she afforded Dr. Davis's opinions little weight. [AR 27.] First, the ALJ noted that the IME panel's evaluation in October 2006 was the most comprehensive evaluation of Gillmore's medical condition and functional capacity for work through that date.  Thus, the ALJ gave it the most weight and considered it significant. [AR 26.] The

35

ALJ acknowledged that while panel physicians were not treating physicians, they provided an extensive and detailed review of all the medical records and examined Gillmore as well. Their examination of Gillmore was consistent with limitations described by the claimant as well as limitations noted by other examining specialists. [AR 26-27.] The panel doctors determined that Gillmore could perform sedentary work as of October 2006, while Dr. Davis apparently opined she could not work in 2005. The ALJ properly explained that Dr. Davis's opinion was both inconsistent with the panel's later evaluation and with Dr. Davis's own progress notes. [AR 27.]

The Court determines that the ALJ carefully evaluated Dr. Davis's opinion and properly assigned it little weight. In so doing, the ALJ provided reasons that were "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003) (internal quotation omitted). Dr. Davis's cursory and partially legible notes provide little evidence of anything. His conclusions that Gillmore could not work or use her arm "at all" were not "well supported by medically acceptable clinical and laboratory diagnostic techniques." SSR 96-2p.

4.     Gillmore attacks a number of the limitations assessed by the ALJ as not being supported by substantial evidence. [Doc. 18, p. 22.] She argues that the ALJ "cannot extrapolate RFC from raw medical narrative" and that the ALJ's RFC is a product of the ALJ's own "inexpert opinion." The ALJ is entrusted with determining the RFC, based on a consideration of all the evidence in the record. SSR 96-5p, 96-8p; 20 C.F.R. § 416.927(e)(2)(2009). The Court rejects Gillmore's unsupported and inaccurate argument that the ALJ "contrived her own RFC." The ALJ's RFC assessment is supported by substantial evidence as discussed at length in her opinion.

More specifically, Gillmore argues that the ALJ "fashioned the limitation of occasional overhead reaching with the upper right extremity from her own interpretation of the medical evidence." [Doc. 18, p. 22.] This is inaccurate.  It is true that the ALJ did not fully accept the IME panel's more severe restriction that she not lift her right arm above 90 degrees, but the ALJ carefully explained that she relied on Gillmore's own testimony that she could engage in overhead lifting although not for long. [AR 26.] Moreover, the ALJ noted that the consultative reviewers opined that Gillmore could lift overhead occasionally. [AR 26-27.]

The ALJ provided a thorough discussion of Gillmore's failure to attend physical therapy as prescribed, the variances between specialists' observations and examinations of Gillmore [AR 22], and the fact that Gillmore was not taking pain medication in 2008 even though narcotic pain medication had helped her previously. [AR 23.]  If anything, the ALJ gave Gillmore the benefit of the doubt by including the limitation in occasional overhead reaching.  The ALJ further explained that the type of reaching the ALJ anticipated in the RFC she determined encompassed no more than momentary reaching to get something off a shelf. [AR 27.]  The Court finds no error and that substantial evidence supported the limitation as described.

Gillmore also asserted that the ALJ's finding that she could walk or stand for 15 minutes at a time was not supported by substantial evidence.  However, Gillmore primarily relies on two medical records from 1998 to 2000 concerning her original ankle injury in an attempt to dispute the ALJ's finding.  The Court determines that substantial evidence in the medical and administrative record supports the ALJ's finding.  For example, the ALJ relied on medical care providers' clinical observations as to Gillmore's ability to ambulate in 2005 and 2006. [AR 20.] Other examinations revealed that Gillmore could walk on her heels and toes. [AR 20.] The ALJ, however, carefully observed that the most recent observation by a physician in 2008 indicated that Gillmore could not

ambulate on her heels, at least while attempting to ambulate with her right elbow flexed and held closely to her body. [AR 20, 136.]

The Court finds the ALJ committed no error and that substantial evidence supports her findings with respect to the RFC.

5.      Lastly, Gillmore challenges the ALJ's credibility findings. The Court determines that the ALJ properly evaluated the credibility of Gillmore's based on her own testimony and the entire administrative record. The ALJ provided specific reasons that were closely and affirmatively linked to substantial evidence in the record. *See* Hamlin v. Barnhart, 365 F.3d 1208, 1220 (10th Cir. 2004).

Examples of why the ALJ found Gillmore lacking in credibility are legion. *See, e.g.,* AR 25-26. Gillmore had a fairly lengthy history of cocaine and methamphetamine use but sometimes denied use of drugs when asked by medical providers. She claimed to have been "clean" since 1993, but then told another physician she was in a 90-day treatment program as late 2003. [AR 17.] Gillmore claimed diagnoses of schizophrenia and bipolar disorder but had no clue why she was given those diagnoses and did not appear to obtain treatment for those conditions. [AR 16.] She was given a referral to a mental health center but did not follow through with the referral. Gillmore sought mental health counseling on only a few sessions, notwithstanding her alleged significant and long-term mental health diagnoses.

Gillmore argued she has severe depression but elected not to take anti-depressants because of unspecified "significant" side effects, side effects that interfered with sexual relations, or for unexplained reasons. While Gillmore claimed she was severely depressed, her daily activity report and that of her boyfriend belied significant mental limitations. [AR 18.]

Gillmore asserted that she suffered significant pain from physical symptoms, but did not attend physical therapy sessions as prescribed. Gillmore stated she could not afford a $5.00 co-pay

for physical therapy, while she could afford to buy cigarettes daily for years. [AR 24.]   Several physicians or consultative doctors questioned Gillmore's cooperation or her possible magnification of pain symptoms. [AR 16-17.]   She claimed to have used a cane, but typically was not observed to use an assistive device.   Moreover, on disability report forms, neither she nor her boyfriend noted that she used a cane.   In addition, when asked about her use of the cane at the ALJ hearing, Gillmore seemed uncertain whether she used her cane on the right or left side.

Based on extensive medical evidence, the ALJ noted that Gillmore actually misrepresented her right foot impairment at the hearing, through the alleged use of her cane and her testimony. "Such misrepresentation undermines her credibility on all impairments she alleges contribute to disability." [AR 20.]

The ALJ correctly assessed Gillmore's credibility with respect to complaints of pain by carefully considering the medications she took over the pertinent time frame, the amounts of medication and their effectiveness, her election not to take medications, the extensiveness of her attempts to obtain relief and follow through with physical therapy, the nature of daily activities, and physicians' reports of their observations, along with inconsistency of non-medical testimony with objective medical evidence.   *See* Kepler v. Chater, 68 F.3d 387, 390-91 (10th Cir. 1993) (discussing factors to consider in assessing credibility).   Under the circumstances of this case, the Court will not disturb the ALJ's properly supported credibility findings.

## VI.     <u>RECOMMENDATION</u>

The Court recommends that Gillmore's motion to reverse or remand for additional administrative hearings be DENIED and that this matter be dismissed with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge